**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Attorneys for Plaintiff and the Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WALTER GILL, individually and on behalf of all others similarly situated, | : | Civil Action No. |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| vs. | : | |
| | : | **CLASS ACTION COMPLAINT** |
| SUBARU OF AMERICA, INC., a New | : | **AND DEMAND FOR JURY TRIAL** |
| Jersey Corporation, and SUBARU | : | |
| CORPORATION, a Japanese | : | |
| Corporation, | : | |
| | : | |
| *Defendants*. | : | |

Plaintiff Walter Gill, individually and on behalf of all others similarly situated, alleges as follows:

1.     Plaintiff brings this class action lawsuit against Defendants Subaru of America, Inc. ("SOA") and Subaru Corporation ("SC") (together, "Subaru") on behalf of himself and a proposed class of past and present owners and lessees of

2015-2019 model year Subaru Outback, Forester, WRX, Legacy, and Ascent vehicles (collectively, "the Class Vehicles").

2.     The Class Vehicles are defective in materials and/or workmanship. The electrical, Class members, seeks damages, free repairs and/or battery replacements, and notification to Class Members about the Defect.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because more than one hundred Class Members have purchased or leased Class Vehicles, which have been marketed throughout New Jersey and nationwide, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there is diversity of citizenship between Plaintiff and Defendants.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendants transact business and are subject to personal jurisdiction in this District.  Moreover, since Defendants have sold and leased a substantial number of Class Vehicles in this District, a substantial part of the acts and omissions surrounding the claims in this case occurred in this District.

5.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this District, including introducing Class Vehicles into the stream of commerce in this District.  Moreover, Defendant SOA

has its principal place of business in this District, as alleged below.

## PARTIES

6.    Plaintiff Walter Gill is a citizen of New Jersey and currently resides in Burlington County.

7.    In late January 2017, Plaintiff purchased a 2017 Subaru Outback from Haldeman Subaru, an authorized Subaru dealer located in Hamilton, New Jersey.

8.    Plaintiff's Class Vehicle bears Vehicle Identification Number 4S4BSAKC7H3338954 and is registered in New Jersey.

9.    When Plaintiff purchased his Class Vehicle, he also purchased a seven-year extended warranty.

10.    Prior to purchasing his Class Vehicle, Plaintiff test drove the vehicle, viewed advertisements for the vehicle, and spoke with Subaru sales representatives concerning the vehicle's features.  Neither Defendants nor their agents, dealers, or other representatives revealed the Defect to Plaintiff at or after the time of purchase.  Plaintiff's injury, damage, and ascertainable loss from purchasing a Class Vehicle with the Defect was caused by Defendants' wrongful concealment of the Defect.

11.    Plaintiff's vehicle was also covered by Subaru's three-year/36,000 mile New Vehicle Limited Warranty ("NVLW").  Plaintiff purchased his Class Vehicle in part because of the extensive warranty coverage that Subaru represented

it would provide.

12.    Less than eight months after Plaintiff bought his Class Vehicle, its battery failed for the first (but not the last) time.  Plaintiff was forced to jump-start his battery in order to restore functionality.

13.    Thereafter, Plaintiff researched the Class Vehicle's premature battery failure on the internet.  He discovered that battery failure was a pervasive defect in the Class Vehicle based on numerous complaints of other consumers.  Plaintiff also read consumer complaints that detailed the futility of Defendants' repairs of the battery.  Based on these complaints, Plaintiff decided not to contact Subaru or Haldeman Subaru about the Defect.

14.    The Class Vehicle's battery thereafter failed three more times, most recently in late March 2020.  Each time a failure occurred Plaintiff was forced to jump-start his battery in order to restore functionality.

15.    Although his Class Vehicle currently functions, due to the Defect's pervasive nature and the fact that Subaru's recommended repairs remedy the Defect only temporarily, Plaintiff cannot be confident in the Class Vehicle.  The Defect remains and will doubtless manifest again and again.

16.    Had Subaru disclosed the Defect before Plaintiff purchased his Class Vehicle, he would not have purchased it or would have paid significantly less for

it, given the presence of the Defect.

17.    Defendant SC is a Japanese corporation, with an address at Ebisu Subaru Building, 1-20-8, Ebisu, Shibuya-ku, Tokyo 150-8554.   SC is responsible for the design, production, distribution, marketing, sale, and servicing of Subaru vehicles, including the Class Vehicles, around the world, including in the United States.

18.    Defendant SOA is a New Jersey corporation, with its principal place of business located at One Subaru Drive, Camden, NJ.

19.    SOA is the wholly-owned subsidiary of SC.  SOA distributes, markets, sells, and services Subaru vehicles in the United States.

20.    At all relevant times, there has been a unity of ownership among SC, SOA, and their agents, such each of them is and has at all relevant times been the alter ego of the others.

21.    For example, upon information and belief, SOA communicates with SC about virtually all aspects of the Subaru products that SOA distributes, including proper repairs for pervasive defects, and whether Subaru will cover repairs to defective parts and assemblies.  Subaru's decision not to disclose the Defect, and not to provide repairs or replacement batteries without cost, was made jointly by SC and SOA as though they were a single entity.

22.    SC and SOA also jointly develop owner's manuals, warranty

booklets, and maintenance recommendations and schedules for the Class Vehicles, as well as TSBs that Subaru issues to authorized dealerships in order to address known defects, including the Defect.

## APPLICABLE LAW

23.    It is appropriate to apply New Jersey law to the claims of plaintiff and Class Members because New Jersey has the most significant relationship to those claims and the conduct of Subaru, including SOA, a New Jersey domiciliary company.  As alleged above, Defendant SOA currently has its principal place of business in Camden, NJ, having opened a new headquarters there in 2018.  From 1986-2018, SOA's principal place of business was located in Cherry Hill, NJ. Thus, when the Class Vehicles were marketed, sold, and leased, and thereafter until this day, New Jersey was at the center of Subaru's conduct regarding the Class Vehicles and the Defect.

24.    Upon information and belief, Subaru's customer relations, technical training center, engineering, marketing, and warranty departments are all located at Camden, NJ headquarters.  From 1986- 2018, they were located at SOA's headquarters in Cherry Hill, NJ.  SOA's customer relations department fielded customer complaints and monitored customer complaints posted to Subaru or third-party websites, including that of NHTSA, in New Jersey, and responded from New Jersey.  The decision of SOA's warranty and engineering departments to

conceal the Defect from consumers and to institute a policy to deny warranty coverage to those in whose Class Vehicles the Defect manifested were made in New Jersey.

25.    Accordingly, Subaru's acts and omissions complained of were developed in and emanated from SOA's headquarters in New Jersey, and Subaru knew of the Electrical Defect through, among other things, the actions of Subaru's divisions and affiliated entities located in New Jersey.  New Jersey thus has the most significant relationship to this litigation and, under New Jersey's choice of law principles, which apply in this New Jersey forum, New Jersey substantive law should apply.

## FACTUAL ALLEGATIONS

### A.    The Defect

26.    Subaru has held itself out as producing quality vehicles, and claims that it "strive[s] to create advanced technology on an ongoing basis and provide consumers with distinctive products with the highest level of quality and customer satisfaction."[1]

27.    The Defect in the Class Vehicles arises from defective materials and/or workmanship.  The electrical system in the Class Vehicles subjects vehicle

---

[1] https://www.subaru.co.jp/en/ir/library/pdf/ar/ar_2019e.pdf at p. 02 (last visited Apr. 22, 2020).

batteries and charging systems to a continuous parasitic drain. The batteries with which Subaru equipped the Class Vehicles are thus too small to overcome the parasitic drain and power the Class Vehicles as consumers reasonably expect automobile batteries to do, predisposing Class Vehicles to sudden battery failure. The parasitic drain on Class Vehicles is constant, even when their engines are not running.

**B.    Subaru's Knowledge of the Defect**

28.    Subaru is experienced in manufacturing and designing consumer vehicles. That experience, and numerous sources of direct and indirect notice to Subaru of the Defect, demonstrate that Subaru knew about the Defect before it began to market the Class Vehicles.

**a.    Internal Data**

29.    Since November 1994, Subaru has employed an internal quality management system "to impress customers through the establishment of quality policy in line with our customer first policy and a high level of integration of safety, enjoyment and environmental performance."[2]

30.    Subaru's Product Quality Management System has four key metrics:

---

[2] https://www.subaru.co.jp/en//csr/consumers/pdf/quality.pdf (last visited Apr. 22, 2020). The remaining citations in this section all refer to information found on this webpage.

- Establish Quality Management System (QMS) based on the Quality Policy and ISO 9001 Standard and put it into practice for orderly and effective operations.
- Clarify the quality targets acceptable to customers at the planning stage.
- Realize the quality targets through quality assurance activities at each stage from development to sales and service.
- Attend to complaints and requests from the market quickly and appropriately to live up to the trust of customers.

31.     With this system, Subaru "works to assure quality in each process from design and development through to sales as well as creating a cycle to create even higher quality products.  In addition, [Subaru] strives to work through this cycle swiftly in order to meet customer needs without any delay."

32.     Subaru's quality management cycle has three stages.  In the design and development stage, Subaru's attention is, or is supposed to be, "given to preventing variability and standardization of tasks from the blueprint creation stage through to production processes."

33.     The production stage involves establishing "process management aimed at preventing quality defects and variability as well as implementation of strict quality inspection and testing."

34.     After vehicles are shipped, the distribution and sales stage begins. This stage collects after-sales information and quality improvements that can be

made.  Subaru collects and analyzes "information on quality defects and requests sent to dealerships and SUBARU Customer Center."

35.     Subaru then takes the quality defect data and "promptly" implements in successive design and development stages.

36.     Finally, "[i]n the event of product defects, not only do we [Subaru] respond properly based on the laws and regulations of each country, but we also determine the specific details of our response by promptly establishing a committee structure for staff from departments involved in quality, including those outside of Japan, to investigate."

37.     Even if Subaru's vigorous quality management system somehow failed to detect the Defect, Subaru learned of it through various other means.

38.     Subaru performs extensive pre-release testing on multiple components of its vehicles, including batteries, electronic control units ("ECUs"), ECMs, and other electrical system components, to confirm that the parts are not defective and comply with Subaru's specifications.  Because the Defect manifests so frequently in Class Vehicles, it is implausible that Subaru's preproduction testing would not have revealed the existence of the Defect to Subaru.

39.     Subaru also receives data about how its vehicles are performing after sale or lease.  Subaru collects information from both drivers and dealerships

through complaints, warranty claims, repair and replacement parts data, and other aggregated data sources.  Subaru has exclusive access to this information.

40.    Defendants' Quality Assurance Group cooperates with Subaru-authorized service technicians to detect potentially widespread vehicle problems and assist in diagnosing vehicle issues.  That Group also collects and analyzes field data including, but not limited to, repair requests made at service centers and dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

41.    Defendants' National Warranty Department examines warranty data that its dealerships and authorized technicians submit in order to identify defect trends in its vehicles.  When a repair is made or battery replaced under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the replaced battery in case Defendants later decide to audit the dealership or otherwise verify the appropriateness of its replacement.  Service centers meticulously provide Defendants with this detailed information about in-warranty repairs because Defendants will not compensate the

service centers for the repair if the complaint, cause, and fix are not sufficiently described.

42.    Defendants knew that numerous replacement batteries were ordered because of the Defect, even prior to the initial sale or lease of the Class Vehicles. Defendants require Subaru service centers to order replacement parts directly from them.  Independent vehicle repair shops that service Class Vehicles also order replacement parts, including batteries, directly from Defendants. Defendants regularly monitor replacement part sales reports, and Subaru's internal teams ship parts that are requested by dealerships and technicians. Defendants thus have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders, including batteries.  Defendants knew of the sudden increase in orders for replacement batteries used in the Class Vehicles, as well as similar Subaru models produced before the Class Vehicles. Thus, the increase in orders alerted them to the scope and severity of the Defect.

43.    Indeed, Subaru's "Quality Management Cycle"[3] graphic demonstrates how Subaru continuously monitors the types of data identified above in order to track, identify, and resolve issues like the Defect:

---

[3] https://www.subaru.co.jp/en/csr/quality.html (last visited Apr. 22, 2020).

822775.3                                   - 12 -



**b.    Complaints by Other Class Members**

44.    Subaru's Customer Relations department routinely monitors the internet for customer complaints and has employed third-party servicers to do the same.  The Customer Relations department also regularly receives and responds to driver calls concerning vehicle issues.

45.    Subaru monitors drivers' safety-related reports on NHTSA's website. Starting no later than January 2015, drivers of Class Vehicles began contacting NHTSA about the Defect.

46.    Many owners and lessees of the Class Vehicles have publicly complained online, or to the Office of Defects Investigation ("ODI") within NHTSA.  ODI conducts defect investigations and administers safety recalls.

47.    Federal law mandates automakers to keep in close contact with NHTSA regarding potential auto defects.  This mandate includes a legal

requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

48.    Automakers thus should (and Subaru does) monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, such as failures of vehicle electrical systems, including batteries.  Subaru knew of the many and consistent complaints about the Defect submitted to NHTSA ODI because Subaru monitored the NHTSA databases.

49.    The following are examples of complaints submitted to ODI concerning the batteries and related issues with the Class Vehicles:

**Consumer No. 1:**
**Date Complaint Filed:** January 8, 2015
**Date of Incident:** January 8, 2015
**Component(s):** Electrical System
**NHTSA ID Number:** 10671119
**Consumer Location:** New Britain, CT
**Summary:** AFTER BEING PARKED OUTSIDE OVERNIGHT WITH TEMPERATURES BELOW 0 DEGREES F, THE VEHICLE STARTED FINE THE FOLLOWING MORNING BUT HAD NUMEROUS WARNING LIGHTS ILLUMINATE (POWER STEERING, AT OIL TEMPERATURE, AMONG OTHERS) WHILE IDLING IN MY DRIVEWAY. VEHICLE WARMED UP FOR 5 MINUTES. ONCE WARMED UP, OWNER TURNED THE VEHICLE OFF AND ATTEMPTED TO RESTART 20 MINUTES LATER. VEHICLE WOULD NOT RESTART BUT OTHER ELECTRICAL COMPONENTS (LIGHTS, RADIO, ETC) WORKED BUT THE STARTER WOULD NOT ENGAGE.

VEHICLE TOWED TO DEALERSHIP FOR DIAGNOSIS OF WHAT
APPEARS TO BE AN ELECTRICAL PROBLEM. *TR

**Consumer No. 2:**
**Date Complaint Filed:** May 6, 2015
**Date of Incident:** May 2, 2015
**Component(s):** Electrical System
**NHTSA ID Number:** 10715057
**Consumer Location:** Andrews, TX
**Summary:** WE STOPPED TO HAVE LUNCH AND 30 MINUTES
LATER THE CAR BATTERY AS DEAD OR SO IT SEEMED AS IT
WOULDN'T TURN OVER. WE HAD TO CALL HIGHWAY SAFETY TO
COME AND HE JUMPED IT OFF. WE GOT SOME AN HOUR LATER
AND THEN WE WENT TO OUR SON'S HOUSE FOR ANOTHER HOUR
AND WHEN WE TRIED TO START IT AGAIN IT WAS DEAD. OUR
SON SORTA ROCKED THE CAR FROM SIDE TO SIDE AND THEN IT
WOULD CRANK.

ON OUR WY HOME WE STOPPED AT THE GROCERY STORE AND
GOT MILK AND THEN IT WAS DEAD AGAIN. A MAN JUMPED IT
OFF AGAIN. NEXT DAY AS WE WERE TAKING THE CAR TO OUR
SUBARU DEALER IT STARTED RIGHT UP. STILL WE TOOK IT ON
IN TO OUR MIDLAND, TX DEALER AND THEY COULD FIND
NOTHING WRONG! WE ARE ELDERLY 87 AND 83 AND CAN'T
TAKE MUCH MORE OF THIS KIND OF TROUBLE. (NOTHING IS
WRONG) WE SAT 3 HOURS IN THE SUN ON SAT AS WE WAITED
FOR ROAD SIDE SERVICE. PLEASE HELP. *TR

**Consumer No. 3:**
**Date Complaint Filed:** August 31, 2015
**Date of Incident:** July 17, 2015
**Component(s):** Electrical System
**NHTSA ID Number:** 10760335
**Consumer Location:** Cambridge, MA
**Summary:** THIS IS NOT EXACTLY A SAFETY PROBLEM, BUT
COULD BE A CRITICAL ISSUE. WE LEFT THE BRAND NEW
SUBARU 1015 FORESTER FOR TWO WEEKS WHILE WE WERE ON
VACATION. WHEN WE CAME BACK THE BATTERY WAS DEAD.
AAA TECH TOLD US THIS IS NOT AN UNCOMMON PROBLEM IN
2015 CARS WITH FULL COMPLEMENT OF FEATURES, AND

TYPING "SUBARU BATTERY DRAINAGE PROBLEM" INTO
GOOGLE BRINGS UP A LITANY OF COMPLAINTS. APPARENTLY
ALL THE ELECTRONICS IN THE CAR DRAIN THE BATTERY EVEN
WHEN THE CAR ISN'T RUNNING. SUBARU IMPLIED IT WAS OUR
FAULT FOR NOT STARTING THE CAR. THAT'S ABSURD. WE HAVE
A 2010 HONDA CIVIC THAT WAS UNDER THE SNOW FOR 6 WKS.
AND IT STARTED RIGHT UP. SUBARU CHECKED OUR BATTERY,
PRONOUNCED IT HEALTHY, SUGGESTED WE BUY A TRICKLE
CHARGER (WHICH WE HAVE DONE), AND SENT US $100 FOR OUR
LOYALTY. NOWHERE IN THE SUBARU LITERATURE DOES IT SAY
THAT THE CAR MUST BE STARTED EVERY FEW DAYS OR WARN
ABOUT BATTERY DRAINAGE. IF WE'D HAD AN EMERGENCY
THAT REQUIRED US TO USE THE CAR WHEN WE FIRST GOT
HOME, WE'D HAVE BEEN POUT OF LUCK. THIS TECHNOLOGY IS
NOT READY FOR PRIME TIME, AND AT THE VERY LEAST
CONSUMERS SHOULD BE WARNED.

**Consumer No. 4:**
**Date Complaint Filed:** April 4, 2016
**Date of Incident:** April 4, 2016
**Component(s):** Electrical System
**NHTSA ID Number:** 10853245
**Consumer Location:** Evergreen, CO
**Summary:** FORESTER SAT FOR 2 WEEKS AND BATTERY WAS
DRAINED COMPLETELY THOUGH NO LIGHTS OR ACCESSORIES
WERE LEFT ON. RECHARGED BATTERY, DROVE IT FOR TWO
DAYS THEN CAR SAT FOR TWO DAYS. AGAIN BATTERY WAS.
COMPLETELY DEAD. VERY DISAPPOINTED AND CONCERNED
OVER LACK OF RELIABILITY

**Consumer No. 5:**
**Date Complaint Filed:** July 8, 2016
**Date of Incident:** June 23, 2016
**Component(s):** Electrical System
**NHTSA ID Number:** 10883494
**Consumer Location:** Carmel, IN
**Summary:** AFTER BEING PARKED AND UNUSED FOR AS FEW AS 3
DAYS, THE BATTERY DRAINS AND THE CAR WILL NOT START.
THIS HAS HAPPENED ON TWO OCCASIONS. SEVERAL OTHER
OWNERS OF 4 CYLINDER 2015 OUTBACKS HAVE REPORTED THIS

ISSUE AT HTTP://WWW.SUBARUOUTBACK.ORG/FORUMS/138-GEN-5-2015-PRESENT/344506-DEAD-BATTERY-2016-A.HTML

**Consumer No. 6:**
**Date Complaint Filed:** September 22, 2017
**Date of Incident:** September 21, 2017
**Component(s):** Electrical System
**NHTSA ID Number:** 11025029
**Consumer Location:** Syracuse, UT
**Summary:** PURCHASED IN AUGUST 2014. YESTERDAY I PUT THE 3RD BATTERY IN THE CAR. THIS SEEMS EXCESSIVE AND MAY INDICATE A PROBLEM WITH DRAW ON THE BATTERY DURING DOWN-TIME. CHARGING SYSTEM CHECKS FINE AND ALSO CHECKED FINE AT THE POINT OF REPLACING THE BATTERY THE OTHER TIMES.

**Consumer No. 7:**
**Date Complaint Filed:** October 26, 2017
**Date of Incident:** October 23, 2017
**Component(s):** Electrical System
**NHTSA ID Number:** 11040055
**Consumer Location:** Unknown
**Summary:** 7,180 MILEAGE, PURCHASED NEW 12-2016. GARAGED KEPT, 80 DEGREE TEMP.

WE BOTH ARE 70 + YEARS, SAFETY RELIABILITY ARE MAJOR CONSIDERATIONS. ON 10-21-17, WE MADE A 20 MILE GROCERY TRIP. AUTO DROVE AS USUAL. ON 10-23-17, WE HAD M.D. APPOINTMENT. STARTER WOULDN'T TURN MOTOR OVER. ORIGINAL BATTERY CAME WITH THE CAR, HAD ZERO ELECTRICAL ENERGY LEFT...I CONNECTED MY BATTERY CHARGER TO THE BATTERY POSTS, WAITED 10 MINUTES. DASH LIGHTS CAME ON, MOTOR STILL WOULDN'T TURN OVER.

CHARGED BATTERY AN ADDITIONAL 30 MINUTES, AND SWITCHED CHARGER MODE TO 50 AMP 'START' MODE, STARTER MOTOR SLOWLY TURNED, AND MOTOR STARTED. MADE THE 60

MILE TRIP TO M.D'S OFFICE, AND BACK HOME, AND WHEN
ARRIVING HOME, FOUND OUT THAT

THE PASSENGER NOR DRIVER'S ELECTRIC WINDOW WOULDN'T
OPEN, TO GET MAIL FROM OUR MAIL BOX.

ON 11/26/17 I TOOK THE CAR TO SUBARU OF JACKSONVILLE.
THREE HOUR WAIT AT DEALER, EVEN WITH AN APPOINTMENT.
THE WARRANTY REPAIR WAS LISTED AS ECM UPDATE.

DEALER'S WORK ORDER COPY RE. WINDOWS WAS " ALL
SYSTEMS OPERATING AS DESIGNED."
SERVICE DEPARTMENT MENTIONED THAT THERE MAY BE AN
ADDITIONAL UPDATE REQUIRED.

WITH OUR LAST COUPLE OF G.M. CARS, VARIOUS "UPDATES OR
ADJUSTMENTS" WERE MADE

VIA SATELLITE.

THIS TECHNOLOGY IS CERTAINLY AVAILABLE...WITH
BLUETOOTH PERHAPS, THROUGH CELL PHONE ?

I MADE THE 30+ MILE TRIP FROM THE DEALER HOME TO ST.
AUGUSTINE WITHOUT FURTHER PROBLEMS.

**Consumer No. 8:**
**Date Complaint Filed:** May 29, 2018
**Date of Incident:** May 25, 2018
**Component(s):** Electrical System
**NHTSA ID Number:** 11098426
**Consumer Location:** Cromwell, CT
**Summary:** I HAVE A TOTAL OF ELECTRICAL POWER LOST FOR 7
TIMES. 2 TIMES WHILE DRIVING I EXPERIENCE ALL ELECTRICAL
LOST WHILE DRIVING ON THE HIGHWAY. I WAS ABLE TO PULL
OVER TO THE SIDE AND WAS ABLE TO JUMP STARTED THE CAR
WITH A JUMPER BATTERY 5 MINUTES LATER. OTHER 5 TIMES IT
HAPPENED WHEN I TRY TO START THE CAR AND I DID NOT GET
ANY ELECTRICAL POWER AT ALL. I TOOK THE CAR TO THE

DEALER TWICE AND THEY CHANGE/FIX THE CAR GROUND THE
FIRST TIME THAT I LOST ELECTRICAL POWER. THEN THEY
CHANGE THE BATTERY AFTER 5 ELECTRICAL POWER FAILURES.
I AM ABOUT TO BRING IT IN FOR THE 7TH TIME FOR THEM TO
LOOK AT IT. I AM TOTALLY LOST CONFIDENT AND NO LONGER
FEEL COMFORTABLE OR FEEL SAFE DRIVING MY TWO BOYS ON
THIS CAR.

**Consumer No. 9:**
**Date Complaint Filed:** June 4, 2019
**Date of Incident:** April 1, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11217905
**Consumer Location:** Traverse City, MI
**Summary:** I ATTEMPTED TO START MY SUBARU ASCENT AND IT
WOULD NOT START. I CONTACTED SUBARU'S TOWING AND
THEY CAME AND JUMPSTARTED THE CAR. THE TOWING
COMPANY INFORMED ME THAT SUBARU'S ASCENT BATTERIES
ARE DEFECTIVE AND THAT THEY HAVE BEEN FORCED TO JUMP
A NUMBER OF THEM. I DROVE TO WORK. THE NEXT MORNING, I
WOKE TO THE SAME PROBLEM. I CALLED SUBARU'S TOWING
SERVICE, AND THEY CAME OUT AGAIN. I TOOK THE CAR TO THE
DEALERSHIP AND THEY TESTED THE BATTERY, BUT THE
BATTERY DID NOT EXHIBIT FAIL CODES. SUBARU WOULD NOT
REPLACE THE BATTERY, DESPITE THE TWO FAILURES. SINCE
THIS TIME, I'VE HAD MULTIPLE BATTERY FAILURES AND
SUBARU CONTINUES TO DENY MY REQUEST FOR
REPLACEMENT.

**Consumer No. 10:**
**Date Complaint Filed:** September 8, 2019
**Date of Incident**: June 21, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11254012
**Consumer Location:** Portland, OR
**Summary:** OUR ASCENT HAS BEEN DYING SINCE JUNE, WHICH
WAS ALMOST A YEAR FROM THE DAY WE BOUGHT IT BRAND
NEW (FIRST ASCENT SOLD BY OUR DEALER). IT HAS LOST
TOTAL POWER ABOUT 7-8 TIMES NOW AND WE'VE HAD IT
TOWED TO OUR SUBARU DEALER THREE TIMES. THE FIRST

TIME THEY SAID IT WAS A DEFECTIVE BATTERY AND GAVE US A NEW BATTERY. THE SECOND TIME THE DEALER PERSON SAID THERE WAS NO PROBLEM AND BLAMED ME FOR LEAVING ONE OF THE INTERIOR LIGHTS ON OVERNIGHT THUS DRAINING THE BATTERY. THE THIRD TIME THEY KEPT THE CAR FOR ABOUT A WEEK AND AFTER THAT THEY SAID IT WAS SOME SORT OF A LOOSE CABLE AND THAT THEY HAD FIXED THE PROBLEM. SINCE THEN THE CAR HAS DIED TWO MORE TIMES. THE FIRST ONE WHEN MY HUSBAND WAS CAMPING WITH THE KIDS (WHICH HAS HAPPENED BEFORE WHILE CAMPING BECAUSE OF THE OPENING AND CLOSING OF DOORS) BUT LUCKILY HE HAD A "JUMP STARTER KIT" WHICH WE HAD ACQUIRED AFTER FEW TIMES AFTER OUR CAR DIED. AND, THAT I MUST ADD THAT IT IS A TOOL THAT SHOULD COME WITH EVERY ASCENT! THE LAST TIME WAS TODAY. PROBABLY BECAUSE THE KIDS LEFT ONE INTERIOR LIGHT ON AGAIN. THEY KEEP CLAIMING IT'S MY FAULT FOR LEAVING THE INTERIOR LIGHT ON OVERNIGHT, AND THAT THE SUBARU TECHNOLOGY REPORTING SYSTEM HAS NOTHING ABOUT THIS. ISN'T THIS AN ABSURD? UNACCEPTABLE THAT A SMALL LITTLE LIGHT CAN DRAIN THE ENTIRE BATTERY POWER ONLY OVERNIGHT. I AM NOT TALKING ABOUT HEADLIGHTS ON OVERNIGHT, IT'S ONLY ONE INTERIOR LIGHT... AND SOMETIMES NOT EVEN THAT, JUST THE FACT THAT WE OPENED AND CLOSED THE DOORS WAY TOO MANY TIMES (EG WHILE CAMPING). THIS IS VERY IRRITATING AND I THINK THEY SHOULD HAVE THIS FIXED.

**Consumer No. 11:**
**Date Complaint Filed:** September 11, 2019
**Date of Incident:** September 10, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11254696
**Consumer Location:** Tigard, OR
**Summary:** BATTERY DEAD SEVERAL TIMES. HAVE HAD TO HAVE IT JUMPED SIX TIMES. BATTERY REPLACED BY DEALER ONCE. I NOTE THAT MANY SUBARU OWNERS HAVE SIMILAR PROBLEM.

**Consumer No. 12:**
**Date Complaint Filed:** September 29, 2019
**Date of Incident:** September 28, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11258886
**Consumer Location:** Oakland, CA
**Summary:** I WAS DRIVING MY FORRESTER 2019, NOTICE THAT IT
WOULD SLOWLY MOVE ONCE I STOPPED AT A STOP SIGN. BUT
THEN IT WOULD JERK INTO A FASTER PACE. YESTERDAY AS I
WAS DRIVING, I STOP AT A BANK ATM. WHEN I WENT BACK TO
THE VEHICLE I PUT MY KEY IN THE IGNITION AND NOTHING
HAPPENED. NOT A SOUND. SO TRIED IT SEVERAL MORE TIMES
WITH THE SAME RESULTS. I HAD TO CALL FOR ROADSIDE
SERVICE. THEY CAME AND GAVE ME A JUMP. THE VEHICLE
STARTED WITH NO PROBLEM. I DID AS THE SERVICE PERSON
TOLD ME TO LET THE VEHICLE RUN FOR AT LEAST 30 MINUTES
SO THE CELLS CAN BUILD UP IN THE BATTERY, SO I DID AS I
WAS TOLD. AS I WOULD TURN THE CORNERS ON THE STREETS-
THE STEERING BECAME VERY DIFFICULT, (IN BOTH
DIRECTIONS). ESPECIALLY AFTER TURNING AT A STOP SIGN, SO
AS I WERE DRIVING I NOTICE THE DASH BOARD WOULD KEEP
BLINKING. I TOOK A PHOTO OF THE GAGES ON THE
DASHBOARD. THE EYESIGHT LIGHT STAYED, BUT THE OTHERS
KEPT BLINKING OFF AND ON. I DROVE THE VEHICLE HOME AND
TRIED TO PARALLEL PARK IN FRONT OF MY HOUSE BUT THE
WHEELS WOULD NOT ALLOW ME TO DO SO. SO I PARKED THE
CAR ACROSS THE STREET WHERE THEIR WERE A LOT MORE
SPACE AND I PARKED THERE. I SET THERE FOR ANOTHER 30
MINUTE BEFORE TURNING OFF THE ENGINE. ONCE I TURNED
THE ENGINE OFF AND TRIED TO START THE ENGINE AGAIN IT
FELL TO TURN OVER. NO SOUND OR ANYTHING JUST LIKE
EARLIER. IN 2018 THEY REPLACE MY BATTERY, BECAUSE I WAS
HAVING TO CALL FOR ROADSIDE SERVICE UP TO 3-4 TIMES A
WEEK BECAUSE THE BATTERY WOULD DIE OUT ON ME. ALL
THIS TOOK PLACE IN A PERIOD OF 3-4 MONTHS. NOW THIS
BATTERY IS APPROXIMATELY 10-12 MONTHS OLD. WHEN I
TOOK IT IN FOR THE NEW BATTERY, I WAS TOLD THE BATTERY
WAS TO SMALL FOR THE CAR. SO NOW I AM STUCK AT HOME
WITHOUT A VEHICLE UNTIL THE SUBARU SHOP OPENS ON
MONDAY AND HOPEFULLY THEY CAN FIX THE PROBLEM. I'VE

NEVER HAD A 2 YEAR OLD VEHICLE THAT'S GIVEN ME THIS
MANY PROBLEMS.

**Consumer No. 13:**
**Date Complaint Filed:** October 18, 2019
**Date of Incident:** October 14, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11269328
**Consumer Location:** Whippany, NJ
**Summary:** I PURCHASED A BRAND NEW 2019 SUBARU LEGACY
3.6R LIMITED AND 3 MONTHS LATER WITH APPROXIMATELY 900
TOTAL MILES THE BATTERY DIED TWICE WHILE PARKED.

**Consumer No. 14:**
**Date Complaint Filed:** October 20, 2019
**Date of Incident:** October 19, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11269609
**Consumer Location:** Santa Cruz, CA
**Summary:** REPEATED AND UNPREDICTABLE BATTERY FAILURE
WITH NO APPARENT CAUSE, I.E. DOME LIGHTS OR OTHER
ACCESSORIES NOT POWERED "ON"., DOORS OR REAR CARGO
HATCH NOT OPEN. DEALER ANALYSIS OF ELECTRICAL SYSTEM
FOUND NO ISSUES HOWEVER REPLACED BATTERY.

LAST OCCURRENCE 10/19/2019 IN THE HOME GARAGE.FOR
RELIABILITY IT WAS NECESSARY TO PURCHASE A PORTABLE
BOOSTER CHARGER COSTING $100.00.

THERE HAS BEEN 8 SUCH OCCURRENCES SINCE THE PURCHASE
(NEW) IN 2016.

PLEASE ADVISE

**Consumer No. 15:**
**Date Complaint Filed:** November 30, 2019
**Date of Incident:** November 29, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11282979
**Consumer Location:** Dublin, OH
**Summary:** MY CAR WAS PARKED IN MY GARAGE AND HAD NOT
BEEN STARTED FOR ONE DAY. THE BATTERY WOULD NOT
START THE CAR, I HAD TO CALL FOR A JUMP. I WAITED
APPROXIMATELY ONE HOUR FOR SOMEONE TO COME
THROUGH SUBARU ROAD SIDE ASSIST. THE BATTERY WAS
RELATIVELY NEW, AS THE ORIGINAL WAS REPLACED 1/2019. WE
TOOK IT TO THE DEALER AND THEY TESTED THE BATTERY AND
ALTERNATOR, WHICH WERE FINE. THEY RECHARGED THE
BATTERY. I PAID FOR THE BATTERY INSPECTION.

**Consumer No. 16:**
**Date Complaint Filed:** December 12, 2019
**Date of Incident:** August 12, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11288705
**Consumer Location:** Crystal Lake, IL
**Summary:** BATTERY DRAINS SO THAT CAR WON'T START. AFTER
HAVING A NEW BATTERY INSTALLED, THE BATTERY IS STILL
SO WEAK THAT THE CAR WILL NOT START, AND THE
ELECTRICAL POWER IS COMPLETELY DRAINED. EVEN THE
CLOCK HAS TO BE RESET. THIS STARTED AROUND 35,000 MILES.
I STOPPED FOR GAS AFTER DRIVING FOR AN HOUR, AND THE
CAR WON'T START WITHOUT A JUMP.

**Consumer No. 17:**
**Date Complaint Filed:** February 2, 2020
**Date of Incident:** February 2, 2020
**Component(s):** Electrical System
**NHTSA ID Number:** 11306550
**Consumer Location:** Dewitt, MI
**Summary:** MY 2019 ASCENT WAS PARKED IN GARAGE
OVERNIGHT. WENT OUT TO CAR AND FOUND REAR TAILGATE
WOULD NOT OPEN AND CAR WOULD NOT START. BATTERY
WAS DEAD. JUMPSTARTED CAR AND DROVE IT TO THE STORE.

WHEN I PARKED THE CAR IT WENT DEAD, CAR WOULD NOT RESTART, AND WOULD NOT LOCK, TAILGATE WOULD NOT OPEN. HAD TO GET ROADSIDE SERVICE TO COME OUT AND START CAR. TOOK CAR TO DEALER AND THEY SAID THEY COULD NOT FIND ANYTHING WRONG BUT DID REPLACE THE BATTERY. SEVERAL WEEKS LATER WHILE CAR WAS PARKED AND LOCKED IN A STORE PARKING LOT I CAME OUT AND FOUND THE REAR TAILGATE OPEN. NO ONE HAD PUSHED THE REMOTE TO OPEN THE TAILGATE? TODAY I FOUND THE CAR PARKED IN THE GARAGE AND THE TAILGATE WOULD NOT OPEN, THE CAR WOULD NOT START, AND THE BATTERY WAS DEAD AGAIN. I COULD FIND NO REASON FOR THE BATTERY TO BE DEAD AGAIN. THE CAR HAD BEEN DRIVEN NORMALLY AROUND TOWN FOR THE LAST FEW DAYS. IT WAS PARKED IN THE GARAGE. ALL THE DOORS WERE SHUT AND NO LIGHTS HAD BEEN LEFT ON. THE CAR WAS PURCHASED IN JUNE 2019 AND HAS LESS THAN 6000 MILES ON IT PLUS THIS IS A NEW BATTERY. I AM CONCERNED ABOUT DRIVING THE CAR AND BEING LEFT ON THE ROAD BY A DEAD BATTERY OR COMING OUT AND FINDING THE REAR TAILGATE OPEN IN A PARKING LOT.

**Consumer No. 18:**
**Date Complaint Filed:** February 15, 2020
**Date of Incident:** February 12, 2020
**Component(s):** Electrical System
**NHTSA ID Number:** 11309279
**Consumer Location:** Portland, OR
**Summary:** CAR SUFFERED 10 UNEXPLAINED ORIGINAL BATTERY DISCHARGES IN YEARS 2-3 OF OWNERSHIP. UPON JUMP START, AUTO WOULD START AND OPERATE NORMALLY FOR 2-5 MONTHS BEFORE NEXT DISCHARGE. SUBARU AUTHORIZED WARRANTY REPLACEMENT THROUGH DEALERSHIP WITH NEW LARGER POWERED BATTERY AT END OF YEAR 3 OF OWNERSHIP. REPAIR STATED FAILURE DUE TO BATTERY LEAKAGE ALTHOUGH NONE WAS OBSERVED BY OWNERS. 13 MONTHS AFTER REPLACEMENT BATTERY WAS INSTALLED, IT DISCHARGED TWICE IN SAME DAY AND WAS TAKEN TO ORIGINAL DEALERSHIP (SUBARU OF PORTLAND). SERVICE TECHNICIAN CHECK DETERMINED BATTERY COULD NOT BE

RECHARGED, COULD NOT DETERMINE REASON FOR ITS
FAILURE, COULD NOT FIND ANY ELECTRICAL PARASITIC
DRAWS AND FOUND ALL SOFTWARE WAS UP TO DATE. OWNER
WAS CHARGED FOR NEW BATTERY AND INSTALLATION AS
FAILED BATTERY WAS NOW OUT OF 1-YEAR SUBARU
REPLACEMENT POLICY. BRIEF INTERNET REVIEW SHOWS THIS
HAS BECOME A COMMON PROBLEM WITH 2016-2017 SUBARU'S.
SUBARU U.S. CORPORATE CUSTOMER CARE DEPARTMENT
DEMONSTRATED NO INTEREST IN TAKING COMPLAINT OR
LOGGING IN ANY DETAIL INFORMATION, DIRECTING OWNER
BACK TO REPAIRING DEALERSHIP. DEALERSHIP CLAIMS NO
RESPONSIBILITY FOR FAILED BATTERIES.

50.    Many other Class Members have also complained on the internet and
in online forums about the Defect in the Class Vehicles.  Class Members also
frequently made their concerns known to Subaru, either directly or through its
authorized dealers, as some of the complaints quoted above (among many others)
reflect.

     **c.**    **Technical Service Bulletins**

51.    Vehicle manufacturers issue TSBs to alert authorized service
technicians of pervasive problems affecting particular models and model years of
vehicles and, in many instances, TSBs recommend procedures for repairing those
vehicles.

52.    TSBs are not issued upon receipt of one or a few complaints about a
problem in a vehicle.  Rather, auto companies at first treat complaints as "one-offs"
or isolated, freak events.  Only once a sufficiently large and persistent body of
complaints is generated do companies such as Subaru charge engineers with

developing a solution to the problem complained of.  Only once the engineers have gone through the process of doing that is a TSB issued.  Thus, if the first TSB relating to the Defect was issued in February 2015, Subaru was likely aware of the Defect months before that, perhaps even when sales of model year 2015 Class Vehicles began in mid-2014.

53.    Subaru has issued nine TSBs on the Defect.  On February 10, 2015, Subaru issued bulletin #07-89-15R, encompassing model year 2015 Legacy and Outback models.  That TSB addressed reports that the vehicles would not start, or that electrical components would suddenly lose power, both symptoms of the Defect.  The TSB instructed service technicians to replace all five relays in the vehicles' interior and main fuse boxes in order to "resolve" the issue.

54.    On January 4, 2016, Subaru amended bulletin #07-89-15R[4] to extend its applicability to model year 2016 Legacy and Outback vehicles, in response to reports that the vehicles would not start, or that electrical components would suddenly lose power.

55.    When the initial TSBs failed to resolve the Defect, Subaru issued a third bulletin, #07-106-16, on February 8, 2016.[5] The TSB instructed technicians to replace the battery sensor in 2015-16 Legacy and Outback vehicles.

---

[4] https://static.nhtsa.gov/odi/tsbs/2016/SB-10081068-0699.pdf (last visited Apr. 22, 2020).
[5] This bulletin is not publicly available.

56.    Because the Defect resides in neither vehicle relays nor battery sensors, Subaru's first three TSBs were ineffective.  Subaru then turned its attention to potentially inexpensive "fixes": software updates Subaru hoped would avoid the clear need to effectively repair Class Vehicle electrical systems.

57.    On June 15, 2017, Subaru issued bulletin #11-174-17R,[6] which covered 2015-2017 WRX, Outback and Legacy vehicles. Rather than direct technicians to replace OEM batteries with batteries that have larger capacities, Subaru merely suggested "[r]eprogram[ing] the ECM following normal FlashWrite procedure[,]" in order to resolve "[p]otential battery discharge (dead battery) after repeated periods of short-trip driving." Subaru issued a similar TSB on June 20, 2017 for its 2017 Foresters, #11-175-17.[7]

58.    Thereafter, Subaru revised bulletin #11-174-17R three times during 2017—June 23,[8] August 8,[9] and October 31[10]—in order to identify an ever-expanding list of vehicles that suffer from the Defect.  As of October 31, 2017, the

---

[6] The original bulletin, issued June 15, 2017, is not publicly available.
[7] https://static.nhtsa.gov/odi/tsbs/2017/MC-10117536-9999.pdf (last visited Apr. 22, 2020).
[8] https://static.nhtsa.gov/odi/tsbs/2017/MC-10117535-9999.pdf (last visited Apr. 22, 2020).
[9] https://static.nhtsa.gov/odi/tsbs/2017/MC-10117543-9999.pdf (last visited Apr. 22, 2020).
[10] https://static.nhtsa.gov/odi/tsbs/2017/MC-10131689-9999.pdf (last visited Apr. 22, 2020).

bulletin applied to 2015-17 Legacy, Outback and WRX vehicles, and 2017-18 Forester vehicles.

59.     When its efforts to address battery discharge did not resolve the Defect, Subaru next attempted to cure it by improving battery charging.  On November 16, 2017, Subaru issued Bulletin #11-176-17,[11] which covers 2015-2016 Legacy and Outback models, and announced the "availability of reprogramming files to optimize the ECM for control of battery charging functions" by again reprogramming the ECM in order to "enhance charging system control and . . . improve[ ] battery life."

60.     As Plaintiff and Class Members' experiences demonstrate, each of Subaru's "fixes" has been ineffective; more than two years later, consumers are still complaining of premature and unexpected battery failure.

61.     Despite knowing of the Defect at or about the time that they began to market the Class Vehicles for sale or lease, Defendants failed to disclose the Defect to consumers.  Nor has Subaru instructed its dealerships to disclose the Defect to Subaru's customers.

62.     Because of Subaru's concealment, consumers were unaware that they were buying or leasing defective vehicles, and vehicle owners and lessees did not

---

[11] https://static.nhtsa.gov/odi/tsbs/2017/MC-10125883-9999.pdf (last visited Apr. 22, 2020)**.**

discover the Defect until their batteries failed and they were forced to pay out of

picket to prematurely replace those batteries.

63.    A reasonable person would consider the Defect to be material to his or

her purchasing decision, and would not have purchased or leased a Class Vehicle if

the Defect had been disclosed in advance, or would have paid substantially less for

the vehicle.  Batteries are integral to vehicle functionality. A vehicle cannot turn

on, let alone operate for the times and distances customers expect, unless

manufacturers equip vehicles with a non-defective electrical system that is capable

of providing safe and reliable transportation.

64.    The Defect further imposes unreasonable and excessive safety risks

on Plaintiff and Class Members, as the example NHTSA complaints referenced

above demonstrate.  The Defect typically manifests after consumers have turned

off their Class Vehicles, stranding operators and their passengers and making them

more vulnerable to potential crime, accidents if stranded on a roadside, and other

risks that could have otherwise been avoided, such as small children or pets

remaining trapped within locked vehicles that cannot be opened after the Defect

manifests.

65.    The existence of the Defect was not known to or reasonably

discoverable by Plaintiff and Class Members before such purchase or lease.

66.    As of this date, Subaru continues to conceal the Defect from

consumers and the public.

**C.    Subaru's Warranty Practices**

67.    Subaru sold and leased Class Vehicles with a written express warranty—the NVLW—covering the Vehicles for three years or 36,000 miles, whichever comes first.  Subaru's NVLW covers most vehicle components, including vehicle batteries.

68.    Subaru's NVLWsi expressly "cover[ ] repairs to correct any vehicle defect" and state that repairs will be performed within a "reasonable time."

69.    Subaru's "Replacement Battery Warranty" covers replacement batteries for 30,000 miles or the balance of the NVLW, whichever is greater.

70.    Subaru also offers prospective vehicle owners two extended warranty plans: the "Classic Coverage" and "Gold Plus Coverage" plans. These plans provide additional warranty coverage for 8-years/100,000 miles or 10-years/120,000 miles,[12] and cover repairs to automotive electrical systems, including electronic control units (ECU) and ECMs.

71.    Subaru provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed.  Buyers and lessees have no pre-sale or pre-lease knowledge or ability to bargain as to the terms of the warranties.

---

[12] https://www.subaru.com/addedsecurity (last visited Apr. 22, 2020).

72.     Subaru frequently evades its warranty obligations, even when vehicles are presented for repairs within an applicable warranty period.

73.     As the experiences of Plaintiff and Class Members demonstrate, when owners or lessees tender their vehicles for repair Subaru often informs them that the Class Vehicles' batteries are performing as anticipated.  Subaru may recharge the battery, but typically instructs vehicle owners to avoid driving Class Vehicles for short distances in order to prevent the Defect from manifesting.  Subaru's "fix" is to instruct Class members not to use Class Vehicles for their ordinary and intended purpose.

74.     Even if Subaru makes warranty repairs, it does so by reprograming vehicle ECMs or ECUs, or replacing failed batteries with similarly defective replacement parts that simply delay the inevitable—premature battery failure— until after the expiration of applicable warranties.

75.     Subaru's failure to rectify the Defect results in significant out of pocket expenses for Class Members.  By failing to provide a permanent and effective fix, Subaru evades its warranty obligations and shifts the costs of the Defect onto its customers.  Subaru's warranties therefore fail of their essential purpose.

76.     Moreover, any efforts by Subaru to limit coverage for the Defect by relying on durational or substantive limits in its express warranties is

unconscionable, and such provisions are unenforceable.  Subaru did not provide

those warranties until after Plaintiff and Class Members had completed their

purchases or leases of their Class Vehicles.  Consumers thus had no ability to

bargain as to the terms of the warranties prior to concluding their transactions.

Plaintiff and Class Members thus lacked equal bargaining power, rendering

Subaru's purported limitations on the warranties procedurally unconscionable.

77.    Subaru's purported limitations on its warranties are also substantively

unconscionable.  Subaru knew that the Class Vehicles had the Defect and would

continue to pose safety risks after the warranties purportedly expired.  Subaru

concealed the Defect from Plaintiff and Class Members, such that they could not

know of or discover the Defect until after it had manifested. Accordingly, any

attempt by Subaru to enforce durational limitations on its warranties shocks the

conscience and is unenforceable.

## CLASS ACTION ALLEGATIONS

78.    Plaintiff brings this action on his own behalf, and on behalf of the

nationwide class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons or entities in the United States who bought or leased a Class
Vehicle (the "Nationwide Class").

79.    Alternatively, Plaintiff seeks to represent the following New Jersey

Class in the event that the Court declines to certify the Nationwide Class:

**New Jersey Class:**

All citizens of New Jersey who bought or leased a Class Vehicle in New Jersey.

The Nationwide Class and the New Jersey Class, together, are hereinafter referred to as "the Class."

80.    Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and any judicial officer who handles this case.  Plaintiff reserves the right to modify, change, or expand the Class definitions based on discovery and further investigation.

81.    <u>Numerosity</u>:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants, Plaintiff believes that Defendants have sold or leased Class Vehicles to thousands of purchasers or lessees.

82.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all Class Members. These questions predominate over any individual questions that may exist.  These common legal and factual questions include, but are not limited:

        a.    Whether the Class Vehicles were sold or leased with the Defect;

        b.    Whether the Class Vehicles suffer from a continuous parasitic

drain within the electrical system;

    c.    Whether the continuous parasitic drain results in premature

            battery failure;

    d.    Whether Subaru knew or should have known about the Defect;

    e.    Whether Subaru, despite knowledge of the Defect, failed to

            disclose the Defect to consumers;

    f.    Whether a reasonable consumer would consider the Defect

            material to a decision to purchase or lease a Class Vehicle;

    g.    Whether Subaru should be required to disclose the existence of

            the Defect;

    h.    Whether Subaru's conduct violates the NJCFA;

    i.    Whether Subaru's conduct breach its warranties;

    j.    Whether Subaru's conduct resulted in unjust enrichment.

83.    <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class since Plaintiff purchased a defective Class Vehicle, as did each member of the Class.  Plaintiff and all Class members sustained economic injuries arising out of Defendants' wrongful conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all Class Members.

84.    <u>Adequacy</u>:  Plaintiff is an adequate representative of the Class.  His interests do not conflict, but instead align, with the interests of the Class that he

seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff and his counsel intend to prosecute this action vigorously in order to protect the interests of the Class.

85.    Superiority:  A class action is superior to all other available means of adjudication of this matter.  The injury suffered by each Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct.  It is not realistic or economically feasible for Class Members to bring individual actions for redress, especially given the cost of likely necessary expert testimony, among other things. Moreover, individual litigation would be an intolerable burden on the court system, while a class action offers the benefit of a complete adjudication in a single matter. Individual litigation also presents a potential for inconsistent or contradictory judgments, which a class action does not.

86.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATIONS OF THE NEW JERSEY CONSUMER
### FRAUD ACT ("NJCFA")

### (N.J.S.A. 56:8-1, et seq.)

87.     Plaintiff repeats the allegations of the preceding paragraphs as if set forth at length herein.

88.     The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.S.A. 56:8-2.

89.     Plaintiff and Class Members are persons or entities that purchased or leased the Class Vehicles.

90.     Defendants knowingly concealed, suppressed, and omitted the material fact that the Class Vehicles are defective, with the intent that Plaintiff and Class Members rely upon that concealment, suppression, and omission when purchasing or leasing Class Vehicles.  The existence of the Defect, present in all from the time of sale or lease forward, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, will cost them damage in the form of

(among other things) repair expense, may render the vehicle inoperable when it manifests, and causes the Class Vehicles to be worth substantially less than they would otherwise be.

91.    Defendants have engaged in unlawful and unconscionable trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities that they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.

92.    Defendants' conduct caused Plaintiff and Class Members to suffer ascertainable loss.  Plaintiff and Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

93.    Pursuant to N.J.S.A. 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**

94.    Plaintiff repeats the allegations of the preceding paragraphs as if set forth at length herein.

95.    Defendants provided all purchasers and lessees of the Class Vehicles with an express three-year/36,000 mile basic bumper-to-bumper warranty, referred

to as the New Vehicle Limited Warranty ("NVLW").

96.     The NVLW became part of the basis of the bargain for consumers who purchased or leased Class Vehicles.

97.     Defendants likewise sold to certain purchasers of Class Vehicles "Classic" and extended warranty plans that provided warranty coverage for seven-years.  Both extended warranty plans purportedly cover repairs to Class Vehicle electrical systems, and became part of the basis of the bargain for consumers who purchased those extended warranty plans.

98.     Accordingly, Defendants' NVLW and other extended warranties are express warranties under state law.

99.     Defendants breached the NVLW and its extended warranties by selling and leasing Class Vehicles with the Defect, and by refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods once the Defect manifested.

100.    Defendants knew of the Defect, but failed and refused to disclose it or to comply with their warranty obligations.

101.    As a direct and proximate cause of Defendants' breach, Plaintiff and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

102.   As alleged above, any attempt by Defendants to disclaim or limit its express warranties is substantively and procedurally unconscionable, rendering those limits or any attempt to disclaim unenforceable under the circumstances.

103.   Plaintiff and Class Members have complied with all obligations under the warranties or have been excused from doing so by virtue of Defendants' breach of the warranties.

## COUNT III
## BREACH OF THE IMPLIED WARRANTY
## OF MERCHANTABILITY

104.   Plaintiff repeats the allegations of the preceding paragraphs as if set forth at length herein.

105.   Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

106.   The Class Vehicles are "goods" as defined under the UCC.

107.   With the sale and lease of each Class Vehicle, Defendants impliedly warranted that the Class Vehicles were of a merchantable quality.

108.   Class Vehicles are not of merchantable quality due to the Defect, which poses an unreasonable risk to driver safety, and potentially leads to significant repair expenses and incidental charges, among other things.

109.   As alleged above, any attempt by Defendants to disclaim or limit this warranty is substantively and procedurally unconscionable, rendering those limits

or any attempt to disclaim unenforceable under the circumstances.

110.   As a direct and proximate cause of Subaru's breach of implied warranty, Plaintiff and Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

111.   Plaintiff and Class Members have complied with all obligations under this warranty or have been excused from doing so by virtue of Defendants' breach of the warranties.

**COUNT IV**
**BREACH OF THE DUTY OF GOOD**
**FAITH AND FAIR DEALING**

112.   Plaintiff repeats the allegations of the preceding paragraphs as if set forth at length herein.

113.   Every contract in New Jersey contain an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent term and may be breached even if there is no breach of a contract's express terms.

114.   Defendants breached the covenant of good faith and fair dealing by, among other things, failing to notify Plaintiff and Class Members of the Defect in the Class Vehicles, and failing to repair the Defect at no cost to Plaintiff and Class Members.

115.  Defendants acted in bad faith to deny Plaintiff and Class Members the benefit of the bargain, as a direct and proximate result of which, Plaintiff and Class Members have suffered injury and damage.

**COUNT V**
**BREACH OF WRITTEN WARRANTY UNDER THE**
**MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. §§ 2301, *et seq.*)**

116.  Plaintiff repeats the allegations of the preceding paragraphs as if set forth at length herein.

117.  Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

118.  Defendants are suppliers and warrantors within the meaning of 15 U.S.C. §§ 2301(4)-(5).

119.  The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

120.  The express warranties that Defendants gave to Plaintiff and Class Members, including but not limited to the NVLW, are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

Defendants breached the express warranties by selling and leasing Class Vehicles with the Defect, and a latent defect that results in premature battery failure, and failing and refusing to honor the express warranties by providing repair of the Class Vehicles or replacement of batteries at no cost to consumers.

121.   Plaintiff and Class Members relied on the existence of the express warranties in deciding whether to purchase or lease the Class Vehicles.

122.   Defendants' breach of the express warranties has deprived the Plaintiff and Class Members of the benefit of their bargain.

123.   The amount in controversy of Plaintiff's claim meets or exceeds the sum or value of $25.00.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this suit.

124.   Defendants have been afforded a reasonable opportunity to cure their breach of written warranties.  Defendants knew of the Defect from consumer complaints, warranty data, and the other direct and indirect sources described above, but persistently failed and refused to provide repair or replacement at no cost to consumers.  Alternatively, Plaintiff and Class Members were not required to afford an opportunity to cure because doing so would have been futile, given Defendants' persistent refusal to repair or replace at no cost to consumers.

125.   As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiff and Class Members have suffered injury and damage.

## COUNT VI
## UNJUST ENRICHMENT

126.   Plaintiff repeats the allegations of the preceding paragraphs as if set forth at length herein.

127.   As the intended and expected result of their conscious wrongdoing, Defendants have improperly profited and benefited from the purchase and lease of Class Vehicles by Plaintiff and Class Members.  Defendants have accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct, Plaintiff and Class Members would not, and did not, receive Class Vehicles of the quality, nature, fitness, or value that had been represented by Defendants, and that reasonable consumers expected.

128.   Defendants have been unjustly enriched by their wrongful conduct alleged herein.

129.   Equity and good conscience militate against permitting Defendants to retain these profits and benefits.

130.   As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and Class Members have suffered injury and damage.

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, demands relief against Defendants as follows:

A.   A determination that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and an Order certifying the Class as defined above;

B.   Appointment of Plaintiff as the representative of the Class and his counsel as Class Counsel;

C.    An award of compensatory, consequential, and treble damages (under the NJCFA), and all other damages to which Plaintiff and Class Members are entitled;

D.    An award of pre-judgment and post-judgment interest on such monetary relief;

E.    Appropriate injunctive and/or declaratory relief, including, without limitation, an Order that Defendants to repair, recall, and/or replace the Class Vehicles or components therein and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence of the Defect;

F.    An award of reasonable attorneys' fees and costs of suit; and

G.    Such further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiff, on behalf of himself and Class Members, demands a trial by jury on all issues so triable.

**LITE DEPALMA GREENBERG, LLC**
*/s/ Bruce D. Greenberg*

Dated: April 23, 2020

Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
bgreenberg@litedepalma.com
***Counsel for Plaintiff and the Class***

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil actions:

- *Amy Burd v. Subaru of America, Inc., et al.*,
  1:20-cv-03095 (D.N.J.) (JHR)(JS)

- *Steven Stone, et al. v. Subaru of America, Inc., et al.*,
  1:20-cv-03232 (D.N.J.) (JHR)(JS)

- *Virginia Tomasian, et al. v. Subaru of America, Inc.*,
- 1:20-03233 (D.N.J.) (JHR)(JS)

I hereby certify that the following statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**LITE DEPALMA GREENBERG, LLC**

Dated: April 23, 2020                    /s/ *Bruce D. Greenberg*
                                          Bruce D. Greenberg
                                          570 Broad Street, Suite 1201
                                          Newark, New Jersey 07102
                                          Telephone: (973) 623-3000
                                          bgreenberg@litedepalma.com
                                          ***Counsel for Plaintiff and the Class***

822775.3